IN THE SUPREME COURT OF NORTH CAROLINA

No. 180A19

Filed 6 December 2019

IN THE MATTER OF: Z.V.A.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 1 March 2019 by Judge J.H. Corpening II in District Court, New Hanover County. This matter was calendared in the Supreme Court on 7 November 2019 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jill Cairo for petitioner-appellee Social Services of New Hanover County and K&L Gates LLP, by Abigail F. Williams, for appellee Guardian ad Litem.*

*David A. Perez for respondent-appellant father.*

*Richard Croutharmel for respondent-appellant mother.*

MORGAN, Justice.

Respondent-father, who is the legal father of the minor child Z.V.A. (Zoey[1]), and respondent-mother appeal from the district court's order terminating their parental rights to Zoey. We affirm.

*Factual Background and Procedural History*

_____

[1] A pseudonym is used to protect the identity of the minor child and for ease of reading.

On 15 December 2016, the New Hanover County Department of Social Services (DSS) received a Child Protective Services report regarding three-day-old Zoey. The report indicated that there was domestic violence between respondent-parents, that respondent-father had issues with alcohol and assaultive behavior, and that respondent-mother had developmental and cognitive issues. In response to the report, DSS began providing in-home services to the family. DSS had previously worked with respondent-parents from 2012 to 2015 in an attempt to address issues with an older child. However, the previous case ended with respondent-father relinquishing his parental rights to the older child and respondent-mother having her parental rights terminated by order of the court.

On 30 March 2017, a DSS social worker visiting respondent-parents' residence noticed that respondent-mother had recently been crying. When asked about her emotional state, respondent-mother reported that respondent-father had become angry and had struck respondent-mother while she was putting Zoey down for a nap. On 3 April 2017, DSS filed a petition alleging that Zoey was a neglected and dependent juvenile. Zoey was placed in the nonsecure custody of DSS.

On 12 July 2017, the district court entered an order adjudicating Zoey as a neglected juvenile based on findings of fact to which respondent-parents stipulated. Respondent-parents were both ordered to complete psychological evaluations and vocational rehabilitation services, and to comply with any resulting recommendations; to engage in parenting education programs; to refrain from drug

and alcohol use; and to provide an adequate living environment for Zoey. Respondent-father was additionally ordered to participate in paternity testing and to engage in domestic violence programs. Zoey remained in DSS custody.

On 22 June 2018, the district court entered a permanency planning order. The district court detailed the progress made by respondent-parents on their respective case plans. The district court also found that respondent-parents were unable to translate what they supposedly learned while working their case plans into successfully changing their behaviors, and as a result, Zoey could not be returned to the family home. The district court set the permanent plan as adoption with a concurrent plan of reunification and ordered DSS to proceed with termination of respondents' parental rights.

On 2 July 2018, DSS filed a petition to terminate respondents' parental rights pursuant to N.C.G.S. § 7B-1111(a)(1)–(2) (2017). On 10 July 2018, Zoey was placed with her maternal aunt in New Jersey.

The termination hearing was conducted from 29–31 October 2018. On 1 March 2019, the district court entered an order finding that the evidence established facts sufficient to support the termination of both respondents' parental rights pursuant to N.C.G.S. § 7B-1111(a)(1).[2] The district court also concluded that it was in Zoey's best interest for her parents' rights to be terminated and thereupon, terminated

---

[2] The district court dismissed the other ground for termination alleged by DSS.

respondents' parental rights.  Respondents each gave timely notice of appeal to this Court pursuant to N.C.G.S. §§ 7A-27(a)(5) and 7B-1001(a1)(1).[3]

*Respondent-Mother's Competency*

Respondent-mother argues that the district court abused its discretion by failing to address whether she required a guardian *ad litem* under N.C.G.S. § 1A-1, Rule 17 (2017).  Respondent-mother contends that the evidence presented at the termination hearing demonstrated that she was unable to manage her own affairs. In our view, the district court did not abuse its discretion here.

Section 7B-1101.1(c) of the North Carolina General Statutes permits the district court, either on the motion of a party or on its own motion, to appoint a guardian *ad litem* for an incompetent parent.  An incompetent adult is defined as one "who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the lack of capacity is due to mental illness, intellectual disability, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition." N.C.G.S. § 35A-1101(7) (Supp. 2018).

District "court decisions concerning both the appointment of a guardian *ad litem* and the extent to which an inquiry concerning a parent's competence should be

---

[3] Evidence was presented that respondent-father was not Zoey's biological father, but no biological father was able to be identified.  The rights of the putative biological father and any unknown fathers were also terminated by the district court, but they are not parties to this appeal.

conducted are reviewed on appeal using an abuse of discretion standard." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015). "An '[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *Id.* (alteration in original) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)). As this Court has previously explained, the district court is afforded substantial deference with respect to its decisions involving a party's competence, because it "actually interacts with the litigant whose competence is alleged to be in question and has, for that reason, a much better basis for assessing the litigant's mental condition than that available to the members of an appellate court, who are limited to reviewing a cold, written record." *Id.* at 108, 772 S.E.2d at 456. Thus,

> when the record contains an appreciable amount of evidence tending to show that the litigant whose mental condition is at issue is not incompetent, the [district] court should not, *except in the most extreme instances*, be held on appeal to have abused its discretion by failing to inquire into that litigant's competence.

*Id.* at 108–09, 772 S.E.2d at 456 (emphasis added).

The instant case does not present such an extreme instance. As reflected by the record evidence underlying the district court's unchallenged findings of fact, although respondent-mother's approximate IQ of 64 indicates a mental disability, the psychologist who examined respondent-mother diagnosed her with only a "mild intellectual disability" because respondent-mother had been able to work and to attend school. Moreover, the district court found that respondent-mother

demonstrated that she had developed adaptive skills to lessen the impact of her disability, and that while working on her case plan, respondent-mother completed empowerment classes to help address the issues of domestic violence in her relationship. The evidence which supported these findings of fact does not suggest that respondent-mother's disability rose to the level of incompetence so as to require the appointment of a guardian *ad litem* to safeguard respondent-mother's interests. Accordingly, we conclude that the district court did not abuse its discretion when it did not conduct an inquiry into respondent-mother's competency.

*Adjudication of Neglect as to Respondent-Father*

Respondent-father argues that no clear, cogent and competent evidence supports the district court's findings of fact which in turn led to its conclusion of law that his parental rights should be terminated based upon his neglect of Zoey.

Termination of parental rights proceedings consist of two stages: adjudication and disposition. N.C.G.S. §§ 7B-1109, -1110 (2017); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner must prove by "clear, cogent, and convincing evidence" that one or more grounds for termination exist under section 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(e), (f) (2017). Thus, we review a district court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). Unchallenged

findings of fact made at the adjudicatory stage are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citing *Schloss v. Jamison*, 258 N.C. 271, 275, 128 S.E.2d 590, 593 (1962)). If the petitioner proves at least one ground for termination during the adjudicatory stage, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110).

Pursuant to Section 7B-1111(a)(1), termination of parental rights is proper where a district court finds a parent has neglected his or her child to such an extent that the child is a "neglected juvenile." N.C.G.S. § 7B-1111(a)(1). For purposes of a termination proceeding, a neglected juvenile is, *inter alia*, one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (Supp. 2018).

When it cannot be shown that a parent is neglecting his or her child at the time of the termination hearing because "the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167 (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). Respondent-father here does not dispute that there was past neglect in this case; he challenges

only the district court's determination that future neglect is likely if Zoey were to be returned to his care. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing. *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232. "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding.*" *Id.*

The district court's determination in the present case that neglect would likely be repeated if Zoey was returned to respondent-father was intrinsically linked to respondent-father's inability to sever his relationship with respondent-mother. The unchallenged findings of fact reflect that respondent-mother struggled with basic parenting skills and relied on respondent-father as a main support for parenting. Although respondent-mother failed to demonstrate that she could independently parent Zoey safely and appropriately, respondent-father would not commit to DSS that he would not leave Zoey alone with respondent-mother, and he declined to have visitation with Zoey separately from respondent-mother.

Respondent-father notes that he testified during the termination hearing that he did not fully understand how his unwillingness to ensure that Zoey was not left alone with respondent-mother was affecting his ability to have Zoey returned to him. He further stated that he would yield on this issue if it meant he could retain his parental rights. However, the district court was not required to credit this

testimonial evidence, particularly in light of other testimony admitted during the hearing. *See In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68 ("[The district court] judge ha[s] the responsibility to 'pass[ ] upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom.'" (second alteration in original) (quoting *Knutton v. Cofield*, 273 N.C. 355, 359, 160 S.E.2d 29, 33 (1968)).

In other portions of his testimony, respondent-father acknowledged that he had multiple conversations with the social worker about respondent-mother's parenting limitations and that respondent-father had responded to DSS's concerns by advocating for respondent-mother to be given another chance at parenting. The DSS social worker testified that respondent-father would not promise her that he would not leave Zoey alone in respondent-mother's care, even though he was repeatedly asked to make that promise. Based on these repeated interactions and respondent-father's consistent view toward this concern of DSS, the district court could properly assume that respondent-father would allow Zoey to be left alone in respondent-mother's care in the future.

This caution exercised by DSS for Zoey's well-being was amplified when respondent-father and respondent-mother would parent Zoey together during visits and legitimized its position about respondent-mother's interactions with the child. The district court made unchallenged findings of fact that during such parental visits, respondent-father would speak to respondent-mother "in an aggressive, harsh and

negative manner" and that he used his body to invade respondent-mother's personal space. In response, respondent-mother would do things intended to upset respondent-father. The social worker testified that these types of behaviors continued throughout the social worker's supervised visits of respondent-parents with Zoey. Even after respondent-parents engaged in counseling together, the social worker felt that "they weren't putting . . . into practice" what they had learned. Based on this testimony, the district court found that "when challenges arise in the relationship, [respondents] are not able to use any of the learned skills to communicate or deal with each other in a more positive and effective manner." Despite this, they both intended to remain in their relationship.

The district court's findings that respondent-father was willing to leave Zoey alone in the care of respondent-mother even though respondent-mother was unfit for such accountability, that respondent-parents continued to be in constant marital discord even while having supervised visits with Zoey, and that respondent-parents intended to remain together despite the aforementioned problems, provided an adequate basis for the court's determination that Zoey would likely be neglected again if she were returned to respondent-father's care. As such, clear, cogent, and competent evidence supported the district court's findings of fact which in turn supported the conclusion that respondent-father's parental rights were subject to termination under N.C.G.S. § 7B-1111(a)(1).

*Judicial Bias*

Finally, both respondent-parents argue that the district court was unfairly biased against them as reflected by the following comments made by the court during the oral announcement of its ruling on the child Zoey's best interest:

> But one of the reasons that I was willing to make the commitment that I made in sending that child – this child – to Newark was what I heard from [the maternal aunt]. And sort of the rest of that story is that I would never have sent this child to live in Newark if I thought that she could be with her parents. Because that creates a distance barrier for these folks that is practically insurmountable. So that's – when I said yes to Newark then that was – that was sort of my point of saying "there's not – there's not any coming back from this." That's part of why they call them permanency planning hearings. Right? So I – I do find that it's in [Zoey]'s best interest for the parental rights of her mom, her legal father, putative father, and any unknown fathers to be terminated.

Respondent-parents contend that this statement regarding the district court's decision to send Zoey to live with her aunt in July 2018—implemented more than four months before the termination hearing—demonstrates that the district court had prejudged the termination case, and therefore should have disqualified itself *sua sponte* from the matter.

Normally, as respondent-parents both acknowledge, a court is not required to recuse itself absent a motion from a party, and when no such motion is made, the issue is not preserved for appellate review. *See, e.g., In re D.R.F.*, 204 N.C. App. 138, 144, 693 S.E.2d 235, 240 (2010) ("When a party does not move for a judge's recusal at trial, the issue is not preserved for our review."); *see also* N.C.R. App. P. 10(a)(1) ("In

order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion[.]"). However, under the circumstances of this case, we elect in our discretion to invoke North Carolina Rule of Appellate Procedure 2 and address respondent-parents' arguments. *See* N.C.R. App. P. 2.

Canon 3C(1) of the North Carolina Code of Judicial Conduct states: "On motion of any party, a judge should disqualify himself/herself in a proceeding in which the judge's impartiality may reasonably be questioned[.]" In arguing that the district court's impartiality could reasonably be questioned based on its statement during its ruling on the best interest phase of this termination of parental rights proceeding, respondents conveniently reconstruct the statement at issue. When Zoey was sent to live with her maternal aunt in New Jersey on 10 July 2018, the district court had already changed the primary permanent plan to adoption and ordered DSS to file a termination petition, which the agency had done a few days earlier. Viewed in this light, the district court's statement during its ruling was merely an explanation that the court had previously taken those steps because it had determined that they were in Zoey's best interest at the time those actions were taken. If the bias alleged here were to be deemed to exist as depicted by respondent-parents and ultimately to require recusal, then the illogical consequence would follow that a district court would not ever be able to preside over a termination hearing after it had previously set the permanent plan for a juvenile as a plan that would imply or be compatible with

termination, because of the inherent implication of bias which would be ascribed to a district court's decision to adopt such a plan. Therefore, considered in context, the district court's ultimate decision here to terminate the parental rights of respondent-parents was wholly consistent with the evidence presented at the termination hearing and nothing in the above-quoted statement of the district court reflects that it had definitively reached a conclusion to terminate respondent-parents' rights to their child Zoey prior to the termination hearing. Indeed, in discerning the district court's execution of fairness and impartiality in its ruling in this case as we resolve the issue of bias, it is worthy to note that the district court dismissed one of the grounds for termination alleged by DSS. In sum, respondent-parents have not shown that the district court had a duty to recuse itself from hearing the termination case.

For the reasons discussed herein, we affirm the district court's termination order.

AFFIRMED.